1
2
3
4
5
6
7
8                UNITED STATES DISTRICT COURT

9               SOUTHERN DISTRICT OF CALIFORNIA

10

11  BAY M., for Anthony M. (deceased),     Case No.:  18-cv-01015-W (JLB)

12                           Plaintiff,    **REPORT AND**
                                           **RECOMMENDATION REGARDING**
13  v.                                     **JOINT MOTION FOR JUDICIAL**
                                           **REVIEW OF FINAL DECISION OF**
14  ANDREW M. SAUL, Acting                 **THE COMMISSIONER OF SOCIAL**
    Commissioner of Social Security,[1]    **SECURITY**
15
                             Defendant.    **(ECF Nos. 16, 17)**
16

17

18

19          This Report and Recommendation is submitted to the Honorable Thomas J. Whelan,

20  United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Civil Local Rule

21  72.1(c) of the United States District Court for the Southern District of California.

22          On May 21, 2018, plaintiff Bay M. ("Plaintiff"), on behalf of Anthony M.

23  ("Claimant"), her deceased husband, filed a Complaint pursuant to 42 U.S.C. § 405(g)

24

25

26  _____

27      [1]     Andrew M. Saul, the new Acting Commissioner of Social Security, is hereby
    substituted as the defendant in this case per Federal Rule of Civil Procedure 25(d).
28

                                            1

seeking judicial review of a decision by the Commissioner of Social Security denying his application for a period of disability and disability insurance benefits. (ECF No. 1.)

Now pending before the Court and ready for decision is the parties' Joint Motion for Judicial Review of Final Decision of the Commissioner of Social Security. (ECF Nos. 16, 17.)[2] For the reasons set forth herein, the Court **RECOMMENDS** that that Judgment be entered affirming the decision of the Commissioner and dismissing this action with prejudice.

## I. PROCEDURAL BACKGROUND

On or about February 21, 2014, Claimant filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, alleging disability since September 30, 2011. (Certified Administrative Record ["AR"] 254-60.) After his application was denied initially and upon reconsideration (AR 154-58, 160-65), Claimant requested an administrative hearing before an administrative law judge ("ALJ") (AR 166-67).

On July 13, 2016, Claimant passed away. (AR 293.) Thereafter, Plaintiff requested to be substituted in for her deceased husband and to proceed with the administrative hearing. (AR 202-04, 212.) An administrative hearing was held on August 29, 2016 and a supplemental administrative hearing was held on December 21, 2016. (AR 38-77, 78-125.) Plaintiff appeared at the initial hearing with counsel, and testimony was taken from her and a vocational expert ("VE"). (AR 38-77.) Plaintiff also appeared at the

---

[2]     The Court notes that the parties' final deadline to submit the Joint Motion for Judicial Review was February 8, 2019. (ECF No. 15.) However, despite being granted over three months of additional time, the parties did not file the Joint Motion for Judicial Review until March 15, 2019, over a month late. (ECF Nos. 16, 17.) Even then, the parties did not manage to file a "joint" motion. Each party filed their own version of the Joint Motion for Judicial Review, each of which is substantially similar, but not identical, and each is signed by only the filing party. (*See id.*) The Court has considered both versions of the Joint Motion, but in this Order the Court will refer to the version filed at ECF No. 16, unless otherwise necessary.

supplemental hearing with the same counsel and testimony was taken from her, a different VE, and a medical expert. (AR 78-125.)

As reflected in his April 5, 2017 hearing decision, the ALJ found that Claimant had not been under a disability, as defined in the Social Security Act, from his alleged onset date through July 13, 2016, the date of his death. (AR 12-34.) The ALJ's decision became the final decision of the Commissioner on March 20, 2018, when the Appeals Council denied Plaintiff's request for review. (AR 1-6.) This timely civil action followed.

## II.    SUMMARY OF THE ALJ'S FINDINGS

In rendering his decision, the ALJ followed the Commissioner's five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520. At Step One, the ALJ found that Claimant did not engage in substantial gainful activity from the alleged onset date of September 30, 2011 through the date of his death. (AR 17.)

At Step Two, the ALJ found that Claimant had the following severe impairments: diabetes mellitus, diabetic retinopathy, bilateral retinal detachment and related visual impairments. (AR 17.) The ALJ further identified the following nonsevere medically determinable impairments: hypertension, diabetic nephropathy, and affective disorder. (AR 17-21.)

At Step Three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in the Commissioner's Listing of Impairments from the alleged onset date through the date of death. (AR 21.)

///
///
///
///
///
///
///

Next, the ALJ determined that Claimant had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. § 404.1567(c), with the following additional limitations:

> frequent climbing of ramps and stairs; frequent balancing, stooping, kneeling, crouching, and crawling; no climbing of ladders, ropes, or scaffolds; must avoid all exposure to hazards (such as moving machinery, unprotected heights); no driving; cannot read normal size print; limited to no depth perception and occasional near acuity (where near acuity is defined as close up work requiring the ability to distinguish shape, size, and nature of small objects such as nuts, bolts, and screws by viewing them); and occasional far acuity.

(AR 22.)

At Step Four, the ALJ determined that Claimant was unable to perform any past relevant work. (AR 26.)

At Step Five, based on the VE's testimony that a hypothetical person with Claimant's vocational profile and RFC could perform the requirements of representative occupations such as a dining room attendant, hotel housekeeper, and cafeteria attendant that existed in significant numbers in the national economy, the ALJ found that Claimant was not disabled. (AR 27-28.)

## III. DISPUTED ISSUES

As reflected in the parties' Joint Motion for Judicial Review of Final Decision of the Commissioner of Social Security, the disputed issues that Plaintiff is raising as the grounds for reversal and remand are:[3]

1. Whether the ALJ erred in disregarding the opinions of Claimant's treating physicians concerning Claimant's physical impairments,

---

[3] Plaintiff's arguments in the Joint Motion do not follow the identified disputed issues in a coherent manner. Accordingly, the Court will address each of the disputed issues raised in the Joint Motion in the order considered by the ALJ according to the Commissioner's five-step sequential evaluation process.

including diabetic retinopathy, peripheral neuropathy, vision loss, and diabetes.[4]

2.      Whether the ALJ erroneously gave controlling weight to the Seagate consultative examiner.

3.      Whether the ALJ erred in finding Claimant's mental impairment nonsevere and in disregarding the opinions of Claimant's treating physicians concerning his mental impairments.

4.      Whether the ALJ properly evaluated the lay witness statements of Claimant and his wife and whether the ALJ's decision is supported by substantial evidence.

(ECF Nos. 16-1 at 11-12; 17 at 11-12.)

**IV.     STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied. *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence means "more than a mere scintilla" but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 575-76 (9th Cir. 1988). Substantial evidence is

---

[4]      Plaintiff does not identify in the Joint Motion which treating physician's opinion concerning Claimant's diabetes the ALJ erred in disregarding. However, to the extent Plaintiff is referring to the opinions of Dr. Lin, Dr. Gelber, Dr. Lessner, or Dr. Henderson as they relate to Claimant's diabetic retinopathy and related vision loss, *see* ECF No. 17 at 8, 12-14, 61-62, the Court addresses the ALJ's treatment of these opinions herein. Plaintiff also does not identify in the Joint Motion which treating physician's opinion concerning Claimant's peripheral neuropathy the ALJ erred in disregarding. In fact, although the ALJ did make a finding that "the objective findings in clinical examinations do not support peripheral neuropathy as a medically determinable impairment" (AR 18), the Joint Motion does not address Claimant's peripheral neuropathy at all. Therefore, the Court does not treat this as a raised claim and does not address it in this Report and Recommendation.

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. This Court must review the record as a whole and consider adverse as well as supporting evidence. *Green v. Heckler*, 803 F.2d 528, 529-30 (9th Cir. 1986). Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).

## V.   DISCUSSION

### A   The ALJ's Step Two Determination

Plaintiff contends that the ALJ erred at Step Two in finding Claimant's mental impairment nonsevere. (ECF No. 16-1 at 32-34, 39-45, 54-59.) In making this finding, Plaintiff contends that the ALJ erred in giving controlling weight to a Seagate medical report regarding Claimant's mental impairments and limitations to the exclusion of reports of Claimant's treating and examining physicians, Dr. Henderson and Dr. Lessner. (*Id.*)

#### 1.   Legal Standard

At Step Two, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. *Smolen v. Chater*, 80 F.3d 1273, 1289-90 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987)). An impairment or combination of impairments may be found "not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Webb v. Barnhart*, 433 F.3d 683, 686-87 (9th Cir. 2005) (quoting *Smolen*, 80 F.3d at 1290); *see also Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988). The Commissioner has stated that "[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step." *Webb*, 433 F.3d at 687 (quoting Social Security Ruling ("SSR") No. 85-28).

Step Two, then, is "a de minimis screening device [used] to dispose of groundless claims," *Smolen*, 80 F.3d at 1290, and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is "clearly

established by medical evidence." SSR 85-28; *see also Yuckert*, 841 F.2d at 306 ("Despite the deference usually accorded to the Secretary's application of regulations, numerous appellate courts have imposed a narrow construction upon the severity regulation applied here."). On review, a court must determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that the claimant did not have a medically severe impairment or combination of impairments. *See Webb*, 433 F.3d at 687.

### 2. Background

In this case, the ALJ determined that Claimant's affective disorder was a medically determinable mental impairment, but concluded that this disorder "did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and was therefore nonsevere." (AR 19.) In making this determination, the ALJ evaluated the medical opinions and evaluations set forth below.

On May 23, 2014, Dr. Ana Maria Andia with Seagate Medical Group performed a Comprehensive Psychiatric Evaluation of Claimant. (AR 473-79.) Dr. Andia diagnosed Claimant with adjustment disorder with depressed mood, noting psychosocial stressors during the past year, including physical health issues and loss of employment, and assessed him as having a GAF score of 62. (AR 478.) Based on her examination, Dr. Andia gave Claimant the following functional assessment: (1) he is able to understand, remember, and carry out simple one- or two-step job instructions; (2) he is mildly limited in his ability to do detailed and complex instructions due to his depressive symptoms; (3) he is able to relate and interact with coworkers and the public; (4) he is mildly limited in his ability to maintain concentration and attention, persistence, and pace due to depressive symptoms; (5) he is able to accept instructions from supervisors; (6) he is able to maintain regular

attendance in the work place and perform work activities on a consistent basis; and (7) he is able to perform work activities without special or additional supervision.  (AR 478-79.)[5]

At Step Two, in evaluating whether Claimant's affective disorder was a severe impairment, the ALJ considered the opinion of Dr. Andia.  (AR 18-19.)   The ALJ summarized Dr. Andia's opinion as follows:

> In a comprehensive psychiatric evaluation performed by Ana Maria Andia, M.D., in May 2014, the claimant reported daily moderate symptoms of feeling sad, decreased appetite, low energy, problems with memory and concentration, and insomnia, noting his response to treatment had been fair ([AR 474]).  However, the claimant told Dr. Andia that his ability to work had not been affected by these symptoms, but rather by his physical problems; he noted that he had made attempts to return to work, but he could not find employment.  He also stated his symptoms did not limit his daily activities. *Id.*  The claimant told Dr. Andia that he likes to go out to the gym and exercise, and his hobbies are working out ([AR 475]).

> Dr. Andia diagnosed adjustment disorder with depressed mood, and alcohol abuse allegedly in full, sustained remission.  She opined that the claimant was able to: understand, remember and carry out simple one or two-step job instructions; relate and interact with coworkers and the public; accept instructions from supervisors; maintain regular attendance in the workplace and perform work activities on a consistent basis; and perform work activities without special or additional supervision.  She also opined he was mildly limited in his ability to carry out detailed and complex instructions, and

---

[5]       Plaintiff asks the Court to reject Dr. Andia's opinion as structurally biased, contending that the Commissioner's reliance on Seagate is "controversial" and Seagate's reports are "dubious."  (ECF No. 16-1 at 32-34.)  Plaintiff purports to attach an affidavit from Mary Mitchell to the Joint Motion, but no such affidavit is attached to either Joint Motion filed in this case.  (*See* ECF Nos. 16, 17.)  However, as the purported statements of Ms. Mitchell claiming the Seagate reports are biased apparently do not relate specifically to Dr. Andia or to this particular case, the Court finds that the affidavit is irrelevant.  *See Alzayadie v. Astrue*, No. 09-CV-1886-JLS JMA, 2010 WL 3169592, at *16 (S.D. Cal. July 26, 2010), *adopted by* 2010 WL 3169591 (S.D. Cal. Aug. 11, 2010); *see also* ECF No. 18-2, *Ta v. Colvin*, 14-cv-02487-MMA (BGS) (S.D. Cal.) (Mitchell Affidavit).  Moreover, the Court finds that Plaintiff has not established that Dr. Andia's opinion in this case was biased.  Accordingly, the Court will treat it as any other opinion by an examining physician.

maintain concentration and attention, persistence and pace due to depressive symptoms ([AR 478-79]).

(AR 18-19.)   The ALJ did not thereafter assign any particular weight to Dr. Andia's opinion.   However, the ALJ relied heavily on Dr. Andia's opinions, as discussed below, in determining that Claimant's mental impairment was nonsevere.

In determining that Claimant's mental impairment was nonsevere, the ALJ explicitly rejected the opinions of Dr. Harry C. Henderson, Claimant's treating psychiatrist.   (AR 18.)   In an opinion dated March 25, 2014, Dr. Henderson diagnosed Claimant with "major depression, recurrent."   (AR 768.)   Dr. Henderson opined that Claimant had "marked restriction of activities of daily living, marked difficulties in maintaining social functioning and often deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner in work settings or elsewhere."   (AR 768.)   Dr. Henderson noted that Claimant was taking strong and potent narcotic medications to control his pain and depression and was experiencing chronic fatigue and sedation due to residual effects of narcotics medications.   (AR 768.)   Dr. Henderson opined that Claimant's chronic fatigue and sedation, as well as his pain and inability to remember and concentrate contributed to his overall impairment.   (AR 768.)   Dr. Henderson further opined that Claimant's ability to adapt to stresses in the working environment was severely limited and not sustainable in the workplace.   (AR 768.)   Dr. Henderson added that Claimant would not be able to compete in the workplace and was in need of continued therapy.   (AR 768.)

The ALJ found that Dr. Henderson's opinions were not supported by the record as a whole, including Claimant's reported activities of daily living.   (AR 18.)   He further found that (1) the record does not contain consistent and substantially abnormal mental status examination findings, (2) formal psychiatric treatment appears to have been quite intermittent in the record as a whole, and (3) the record contains no evidence of psychiatric emergency room visits or inpatient admissions.   (AR 18.)

In his discussion at Step Two, the ALJ also addressed a psychological evaluation performed by Milton Lessner, Ph.D.,[6] in August 2014.  (AR 19 (citing AR 480-90).)  The ALJ noted that Dr. Lessner diagnosed Claimant with major depression with psychotic features, and passive-aggressive personality disorder, and assessed him with a Global Assessment of Functioning ("GAF") score of 40, suggesting significant difficulty functioning.  (AR 19, 489.)  The ALJ did not accord any specific weight to the evaluation of Dr. Lessner because he "did not assess any specific limitations in his mental residual functional capacity."  (AR 19.)  The ALJ specifically did not accord substantial weight to the assessed GAF score of 40 because the "GAF scale is no longer used to assess global functioning."  (AR 19 n.1.)

### 3.  Analysis

To support a finding that an impairment is not severe, the ALJ must (1) carefully evaluate the medical findings that describe the impairment, which include "the objective medical evidence and any impairment-related symptoms"; and (2) make an informed judgment about the limitations and restrictions the impairment and related symptoms impose on the individual's physical and mental ability to do basic work activities.  SSR 96-3P.

In evaluating the severity of mental impairments, an ALJ is required to follow a special psychiatric review technique at each level of the administrative review process.  20 C.F.R. § 404.1520a(a); *see also Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 725 (9th Cir. 2011).  Once an ALJ determines that the claimant has a medically determinable mental impairment, he must rate the degree of functional limitation resulting from the impairment in four broad functional areas: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.

---

[6]    The ALJ refers to Dr. Lessner as Dr. Milton.  (*See* AR 19.)  As Dr. Lessner's opinion indicates that his name is Milton Lessner, the Court will refer to him Dr. Lessner in this Order.  (*See* AR 480-90.)

20 C.F.R. §§ 404.1520a(b), (c). In rating the degree of limitation, the ALJ uses the following five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). If the ALJ rates the degrees of the claimant's limitation as "none" or "mild," the impairment is generally considered not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d).

Here, the ALJ assessed the four areas of mental functioning, known as the "paragraph B" criteria, finding that Claimant had only "mild" limitation in each area, and therefore his medically determinable mental impairment was not severe. (AR 19-20.) In assessing each area, the ALJ relied exclusively on Dr. Andia's medical opinions and Claimant's own statements. (AR 19-20.) The ALJ did not consider Dr. Henderson's opinions, or the objective findings of Dr. Lessner. Accordingly, the Court turns to address whether the ALJ erred in rejecting Dr. Henderson's opinions and failing to consider Dr. Lessner's evaluation.

a. *Legal Standard*

Medical opinions are among the evidence that the ALJ considers when assessing a claimant's ability to work. *See* 20 C.F.R. § 404.1527(b). Case law distinguishes among the opinions of three types of physicians: (1) those who directly treated the claimant (treating physicians), (2) those who examined but did not treat the claimant (examining physicians), and (3) those who did neither (nonexamining physicians). *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), as amended (Apr. 9, 1996). The medical opinion of a claimant's treating physician is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)). "When a treating physician's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and

18-cv-01015-W (JLB)

specialization of the physician." *Id.* (citing 20 C.F.R. § 404.1527(c)(2)-(6)). Greater weight is also given to the "opinion of a specialist about medical issues related to his or her area of specialty." *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(5)).

If a treating or examining doctor's opinion is contradicted by another doctor's opinion, as is the case here, "an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

"The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Lester*, 81 F.3d at 831 (emphasis in original). However, "[o]pinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1986)).

b.  *Dr. Henderson*

In his opinion dated March 25, 2014, Dr. Henderson represented that he had been treating Claimant on a bi-monthly basis since October 2012 for depression and psychosis due to sudden blindness and diabetic retinopathy. (AR 766.) Therefore, although the record contains only three treatment records of Dr. Henderson, there is evidence he treated Claimant bimonthly for over a year and was continuing to treat Claimant through at least November 2014. (*See* AR 18, 339, 359, 386-87, 766-71.) Dr. Henderson opined that

18-cv-01015-W (JLB)

Claimant "exhibited all the typical effects of depression and hopelessness." (AR 766.) Dr. Henderson further opined that Claimant was "having frequent panic attacks, and bouts of hallucinations" and there was "evidence of psychosis and schizophrenia as he was haunted by instances of abuse." (AR 767.) Dr. Henderson noted that "[p]ain, depression and recurrent obsessive thoughts interfere with concentration and attention," highlighting the fact that Claimant could not "recall three nouns after three minutes" and could not "perform serial 3s," while his ability to concentrate upon even simple new tasks was poor. (AR 767.) Dr. Henderson's treatment notes also indicate that Claimant was being treated with medication. (*See* AR 769-70.) As set forth above, Dr. Henderson concluded that Claimant had "marked restriction of activities of daily living, marked difficulties in maintaining social functioning and often deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner in work settings or elsewhere." (AR 768.)

The first reason cited by the ALJ for rejecting the opinions of Dr. Henderson was that his statements were not supported by the "claimant's reported activities of daily living." (AR 18.) Inconsistency between a physician's opinion and a claimant's daily activities suffices as a specific and legitimate reason for discounting a treating physician's opinion if supported by substantial evidence from the record as a whole. *See Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014); *Morgan*, 169 F.3d at 600-02.

In his decision, the ALJ noted Dr. Henderson's statement that Claimant had "become withdrawn and had difficulty connecting with others; he stayed home by himself all day and did not go out or have any social function." (AR 18 (citing AR 766).) However, as the ALJ noted, Claimant told Dr. Andia that his ability to work had not been affected by his "symptoms of feeling sad, decreased appetite, low energy, problems with memory and concentration, and insomnia," but rather by his physical problems. (AR 18 (citing AR 474).) The ALJ further noted that Claimant informed Dr. Andia that "his symptoms did not limit his daily activities" and that "he like[d] to go out to the gym and exercise, and his hobbies [were] working out." (AR 18 (citing AR 475).) In assessing Claimant's ability to

interact with others, the ALJ noted that Claimant lived with his wife and parents and reported to Dr. Andia "getting along well with people at work, and having good relationships with family." (AR 20 (citing AR 475).) The ALJ further noted Claimant's own Function Report in which he stated that he "was able to relate and interact with coworkers and the public, and accept instructions from supervisors." (AR 20 (citing AR 307-15).)

Based on the foregoing, the Court finds that the ALJ reasonably determined that Claimant was less affected by his memory and concentration problems and was more able to engage in daily activities and interact with others than suggested by Dr. Henderson. Accordingly, the Court finds that this was a specific and legitimate reason supported by substantial evidence for rejecting Dr. Henderson's opinions regarding Claimant's restriction of activities of daily living, difficulties in maintaining social functioning, and deficiencies in concentration, persistence, or pace.

The next reason cited by the ALJ for rejecting the opinions of Dr. Henderson was that the record "does not contain consistent and substantially abnormal mental status examination findings." (AR 18.) In his decision, the ALJ noted Dr. Henderson's representation that he had been treating Claimant on a bi-monthly basis since October 2012 for depression and psychosis due to sudden blindness and diabetic retinopathy. (AR 18 (citing AR 766).) However, despite Dr. Henderson's statement that he treated Claimant on a bi-monthly basis, the record only includes a single page of treatment notes from each of three separate appointments with Dr. Henderson. (*See* AR 386-87, 769-71.) The treatment notes are mostly illegible, but do not appear to include any mental status examinations. (*See* AR 386-87, 769-71.) The notes provide a space for the physician's "Mental Status Examination" of the patient's appearance, attitude, behavior, speech, affect, suicidality, homicidality, thought content, hallucinations, delusions, thought process, orientation, insight, and judgment. (*See* AR 386-87, 769-71.) Dr. Henderson did not document any findings in this space, but rather made a few notes under "Clinical Impression" which appear to be documentation of the claimant's subjective complaints. (*See* AR 386-87, 769-

71.) In addition to his own treating notes, Dr. Henderson stated in conclusory fashion that his opinions were also based on reports from Claimant and his review of Claimant's medical records consisting of Scripps treating notes, ophthalmologist Dr. Lin's treating notes, and Dr. Lessner's psychological evaluation. (*See* AR 766-67.)

"[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, . . . or by objective medical findings." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)). Here, although Dr. Henderson stated that he had been treating Claimant on a bi-monthly basis, the record only includes a single page of treatment notes from each of three separate appointments and those notes do not reflect any mental status examinations performed by Dr. Henderson. Dr. Henderson also stated that he relied on Claimant's treatment notes from Scripps, including those from Dr. Lin. However, these notes almost exclusively concern Plaintiff's physical ailments, *e.g.*, his diabetes, hypertension, and vision loss. Dr. Henderson further stated that he relied on Dr. Lessner's psychological evaluation. However, Dr. Henderson did not state which of Dr. Lessner's findings he relied on in reaching his opinions. As Dr. Henderson's opinions were conclusory, brief and unsupported by the record as a whole or objective medical findings, the Court finds that this was a specific and legitimate reason supported by substantial evidence for the ALJ to reject Dr. Henderson's opinions.

The final reasons cited by the ALJ for rejecting the opinions of Dr. Henderson were that "[f]ormal psychiatric treatment . . . appears to have been quite intermittent in the record as a whole" and there is "no evidence of psychiatric emergency room visits or inpatient admissions." (AR 18.) As noted above, in his opinion dated March 25, 2014, Dr. Henderson represented that he had been treating Claimant on a bi-monthly basis since October 2012 for depression and psychosis due to sudden blindness and diabetic retinopathy, and the record indicates that he continued to see Claimant through at least November 2014. (*See* AR 18, 339, 359, 386-87, 766-71.) Therefore, although the record contains only three treatment records of Dr. Henderson and no documentation of any

emergency room visits or hospital stays, the Court does not find that this was a specific and legitimate reason supported by substantial evidence for rejecting Dr. Henderson's opinions.

Based on the foregoing, as the ALJ provided two specific and legitimate reasons supported by substantial evidence in the record, the Court finds that the ALJ did not err in rejecting the opinions of Dr. Henderson in determining whether Claimant's mental impairment was severe at Step Two.

### c. *Dr. Lessner*

Dr. Henderson referred Claimant to Dr. Lessner for a consultation. (AR 480.) On August 4, 2014, Dr. Lessner performed several tests on Claimant, including the Mooney Problem Check List, Rotter Incomplete Sentence Blank, Beck Depression Inventory, Bender Gestalt Test, and Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"). (AR 485.) Dr. Lessner noted that Claimant "appeared to be confused and disoriented" and his "responses to the Infrequency [S]cale (Validity-MMPI-2) would show that he is deeply disturbed and in considerable turmoil." (AR 485.) Dr. Lessner noted that Claimant's "highest clinical scale score (8)(MMPI-2) would manifest that [Claimant] is in acute psychological despair." (AR 486.) Dr. Lessner also noted that Claimant's "2 coded clinical configuration (i/8) (MMPI-2) would show that [he] harbors feelings of hostility and aggression but is not able to express them in a modulated manner." (AR 487.) Claimant's "2 code configuration (8)(1) (MMPI-2)" also indicated that Claimant "harbors bizarre somatic complaints of a vague, weird dimension." (AR 487.) In this regard, Dr. Lessner noted that Claimant had attacks in which he could not control his movements or speech but knew what was going on around him, as well as blank spells in which his activities were interrupted, and he did not know what was going on around him. (AR 488.)

Dr. Lessner stated that the results of the Bender Gestalt Test suggested depression and indicated suspiciousness, paranoia, and obsessive-compulsive rigidity, as well as a tendency toward social alienation, repression, lack of sensitivity towards others, and low frustration tolerance. (AR 488-89.) Dr. Lessner also stated that there was evidence of psychotic conditions as reflected by Claimant's erratic beliefs and hallucinatory behavior.

(AR 488.)   In addition, Dr. Lessner noted that a feature that seemed to repeat itself throughout Claimant's protocol was his "use of denial." (AR 489.) Dr. Lessner stated that this was "emphatically reflected by his responses to the Beck Depression Inventory." (AR 489.)   Dr. Lessner stated that "[j]udging by his choices of symptoms it would appear that [Claimant] is subtly covering up his dysthymic annoyances and disparities." (AR 489.) As an example, Dr. Lessner stated that Claimant's "remark that he has not lost interest in people did not match with his high scores in the social alienation scales (MMPI-2)." (AR 489.)   Dr. Lessner, as noted above, thereafter diagnosed Claimant with major depression with psychotic features and passive-aggressive personality disorder, and assessed him with a GAF score of 40.  (AR 489.)

Here, as noted above, the ALJ discussed Dr. Lessner's opinion in brief detail but did not assign a specific weight to the opinion because Dr. Lessner "did not assess any specific limitations in [Claimant's] mental residual functional capacity." (AR 19.)   The Court agrees with this assessment.  While Dr. Lessner diagnosed Claimant with major depression with psychotic features and passive-aggressive personality disorder, he did not assess or opine as to what Claimant could and could not do as a result of his mental health condition. *See* 20 C.F.R. § 404.1527(a)(1).   The ALJ therefore did not actually reject any of Dr. Lessner's opinions.  Accordingly, the Court finds that the ALJ did not err. *See, e.g., Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223 (9th Cir. 2010) (where a physician's report did not assign any specific limitations or opinions regarding the claimant's ability to work, "the ALJ did not need to provide 'clear and convincing reasons' for rejecting [the] report because the ALJ did not reject any of [the report's] conclusions"); *Montez v. Astrue*, 320 F. App'x 532, 534 (9th Cir. 2009) (finding the ALJ did not err by not assigning a specific weight to a treating physician's opinion where the ALJ commented that it placed no restrictions on the claimant's ability to work).

The Court acknowledges that several of Dr. Lessner's findings, including the statement that Claimant was in "acute psychological despair" would tend to indicate that Claimant's mental impairment was severe.  However, the Court further notes that during

the initial hearing Plaintiff did not mention Claimant's depression or any mental impairments as a reason for his inability to work.[7] (*See* AR 38-77.)  Moreover, several of the medical records provided by Plaintiff, including a few that post-date Dr. Lessner's opinion, state that there was no evidence of depression.  (*See, e.g.*, AR 392 (3/16/10), 415 (6/7/13), 412 (11/15/13), 493 (8/19/14), 631 (5/27/15), 667 (3/31/16).)  Accordingly, substantial evidence in the longitudinal record, including Claimant's own statements, as discussed below, supports the ALJ's determination that Claimant's depression was nonsevere.  Therefore, the Court finds that the ALJ did not err at Step Two in finding that Claimant's medically determinable mental impairment of affective disorder was nonsevere.  (AR 19-20.)

## B.     The ALJ's Step Three Determination

Although not expressly identified as a disputed issue, Plaintiff contends in her summary of the medical evidence that the ALJ erred at Step Three in finding that Claimant's visual impairment did not meet or medically equal one of the impairments listed in the Commissioner's Listing of Impairments from the alleged onset date through the date of death.  (ECF No. 16-1 at 6-8.)  As the Commissioner discussed this argument in the Joint Motion, the Court will address it below.

"If a claimant has an impairment or combination of impairments that meets or equals a condition outlined in the 'Listing of Impairments,' then the claimant is presumed disabled at step three, and the ALJ need not make any specific finding as to his or her ability to perform past relevant work or any other jobs." *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001) (citing 20 C.F.R. § 404.1520(d)).  For an impairment or combination of impairments to meet a Listing, all of the criteria of that Listing must be satisfied for the requisite

---

[7]     When asked by the ALJ at the initial hearing what was going on with her husband in the last couple of years before he passed away "besides the visual problems," Plaintiff only responded, "He had diabetes and . . . high blood pressure."  (AR 52.)  She testified that he was "tired" and would "always complain about blurred vision."  (AR 52.)

duration period. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (the impairment "must meet *all* of the specified medical criteria" in the Listing); *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii); 404.1509. "An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment." *Lewis*, 236 F.3d at 512. "A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so." *Id.* (citing *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990) (holding that ALJ erred by failing to consider evidence of equivalence)).

Plaintiff specifically contends that the ALJ erred in finding that Listing 2.02 did not apply. (*See* ECF No. 16-1 at 6; AR 21.) A claimant has statutory blindness if his visual disorder meets the criteria of Listing 2.02. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 2.00(A)(2)(c). Listing 2.02 is met if the claimant's "[r]emaining vision in the better eye after best correction is 20/200 or less." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 2.02. In determining that Claimant did not meet Listing 2.02, the ALJ stated:

> In this case, the medical records reveal the claimant's remaining vision in the better eye was 20/40 after best correction (Exhibit 8F). His vision was reported as 20/60 or 20/70 in other visits, but there is no evidence that the vision in his better eye was ever anywhere close to 20/200. . . . Therefore, based on the evidence, the undersigned concludes that the severity of the claimant's visual impairments, either singly or in combination, did not meet or equal the criteria of section[] 2.02. . . .

(AR 21.)

The ALJ described Claimant's visual history as follows:

> The claimant was diagnosed with diabetic retinopathy for which he underwent right eye retinal detachment repair in November 2013, and left eye pars plana vitrectomy and endolaser treatment in December 2013 ([AR 424, 428]). In August 2014, the claimant underwent right eye pars plana vitrectomy, scleral buckle, and retinectomy due to proliferative diabetic retinopathy and retinal detachment (Exhibit 8F/12.)
>
> . . .
>
> In April 2015, [the claimant's] distance visual acuity in the left eye was 20/40, but he had a cataract in the right eye ([AR 649]). The claimant underwent surgery for a white cataract in the right eye on August 17, 2015 ([AR 657]).

He reported some improvement in a follow-up examination on August 27, 2015 ([AR 672]).

. . .

The claimant's past eye history included a vitrectomy surgery in the right eye on November 25, 2013, and in the left [e]ye on December 9, 2013; he also had additional laser treatments in the left eye on November 12, 2013 and January 10, 2014. His last eye examination on January 10, 2014 revealed the right eye was only able to see fingers held a few feet in front of him (he could not see any letters on an eye chart), and the left eye had visual acuity of 20/60. Dr. Lin noted this level of vision made it very difficult to drive or work; he also noted it was possible the claimant's vision may improve slightly over time, but this was not certain ([AR 385, 554-71, 774-75]).

Philip Gelber, M.D., an impartial medical expert Board certified in ophthalmology, testified at the December 21, 2016 hearing by telephone ([AR 772-73]). Having reviewed the evidence of record through [AR 772-73], Dr. Gelber testified that on January 10, 2014, the claimant's right eye was limited to finger counting,[8] and his left eye was at 20/60, so that the claimant was essentially functioning with only one eye. Dr. Gelber noted that, per [AR 492-508], vision in the right eye was again very poor, limited to hand motion, but the left eye was pretty stable at 20/40-2, i.e., the claimant missed 2 letters on the 20/40 line. Then, as reflected in [AR 509-26], the claimant's left eye was again at 20/60, and it was corrected slightly to 20/40, with the right eye again at the finger counting level.

(AR 23 (footnote added).)

Plaintiff and the ALJ agree that Claimant's left eye was his better eye. (*See* ECF No. 16-1 at 2-5; AR 23-24.) Plaintiff argues that Claimant's "left eye vision was at times 20/200 or even worse, especially in 2013." (ECF No. 16-1 at 6.) The underlying record

---

8    *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 2.00(A)(5)(a)(ii) ("A visual acuity recorded as CF (counts fingers), HM (hand motion only), LP or LPO (light perception or light perception only), or NLP (no light perception) indicates that no optical correction will improve your visual acuity. If your central visual acuity in an eye is recorded as CF, HM, LP or LPO, or NLP, we will determine that your best-corrected central visual acuity is 20/200 or less in that eye.").

18-cv-01015-W (JLB)

demonstrates that Claimant's left eye vision as of November 12, 2013 was 20/60-2. (AR 422.) Thereafter, Claimant's left eye vision appears to have been 20/200 or worse on November 29, 2013 and December 13, 2013, shortly before and after surgery on his left eye. (*See* AR 405 (20/LP in left eye), 407 (20/200 "SC" in left eye), 424-26 (operative report dated 12/9/13)).[9] However, beginning in late December 2013, through September 2015, there is no indication in the record that Plaintiff's left eye vision was ever 20/200 or worse. (*See* AR 585, 597, 595, 603, 500, 519, 611, 649, 672, 670.) A claimant is only considered disabled at Step Three if the impairment meets the duration requirement, which provides that the impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. §§ 404.1525(c)(3), (4), 404.1509, 404.1581. Therefore, although the ALJ inaccurately stated that "there is no evidence that the vision in his better eye was ever anywhere close to 20/200," Plaintiff does not meet the duration requirement. Accordingly, any error committed by the ALJ at Step Three is harmless. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (noting the Ninth Circuit has deemed legal errors harmless where it was clear they did not alter the ALJ's decision).

### C.    Treating Physicians

Next, Plaintiff contends that the ALJ improperly rejected the opinions of Dr. Gelber and Dr. Lin, who were Claimant's treating physicians, in assessing Claimant's RFC.

#### 1.    Dr. Lin

Dr. Richard Lin provided a letter "To Whom It May Concern" dated January 21, 2014. (AR 385.) Dr. Lin treated Claimant at Scripps Clinic Division of Ophthalmology. (AR 385.) The letter described Claimant's status and treatment. (AR 385.) The letter concluded as follows:

---

[9]    The designation "OS" refers to the left eye, and the designation "SC" means without correction. (*See* ECF No. 16-1 at 17.)

At [the Claimant's] last eye examination on January 10, 2014, his right eye was only able to see fingers held a few feet in front of him (he cannot see any letters on an eye chart). The left eye had visual acuity of 20/60. This level of vision makes it very difficult for him to drive or work. In addition, he may also require further laser treatments or eye surgeries in the future. Although it is possible his vision may improve slightly over time, this is not for certain. Please extend to him any disability benefits for which he may qualify due to his impaired vision.

(AR 385.) Dr. Lin provided no further opinions.

In his decision, the ALJ described Dr. Lin's letter. (AR 23.) However, he did not treat Dr. Lin's letter as an opinion and therefore did not evaluate what weight he believed it deserved. "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).

The only concrete restriction contained in the letter was the reference to Claimant's difficulty driving. This statement does not contradict the other medical opinions in the record. Dr. Gelber, the testifying medical expert, as well as the State Agency physical medical consultants, opined that limitations were appropriate due to Claimant's visual impairment. (*See* AR 84-98, 133-35, 147-49.) Claimant's RFC also included a limitation to no driving. Accordingly, to the extent Dr. Lin's medical opinion was not addressed, it was harmless error. *See Molina*, 674 F.3d at 1115.

Dr. Lin also opined that Claimant's limitations would make it "very difficult" for him to work and asked that he be extended any appropriate social security benefits. Dr. Lin did not opine that Claimant qualified for benefits, but merely urged the recipient of the letter to extend Claimant any benefits "for which he may qualify." (AR 385.) Even if Dr. Lin had offered the opinion that Claimant qualified for disability benefits, the ultimate issue of disability is reserved to the Commissioner, and any opinion by Dr. Lin on this ultimate issue, which would not be considered a "medical opinion," would not be binding on the

ALJ.  *See* 20 C.F.R. § 404.1527(d)(1), (3); *Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1986).

2.    Dr. Gelber

a.    *Opinions*

Dr. Philip Joseph Gelber, an impartial medical expert, Board-certified in ophthalmology, testified at the supplemental administrative hearing on December 21, 2016.  (AR 23, 84-98, 772-73.)  Dr. Gelber reviewed the medical record and found the record sufficient for him to offer medical opinion testimony on Claimant's visual and ophthalmological issues.  (AR 85.)  Dr. Gelber opined that on January 10, 2014, Claimant's "right eye was finger counting and that would meet the listing and he would be a one-eyed patient."  (AR 88-89.)  Because he was a one-eyed patient, Dr. Gelber opined that Claimant would have some restrictions.  (AR 90.)

Dr. Gelber stated, "With one eye they don't have good depth perception, so [Claimant] couldn't have gotten any jobs that required any kind of depth perception."  (AR 90.)  Dr. Gelber then explained the implication of the restriction, stating, "Well, there would be certain types of jobs where he might have to put certain parts of something that he was working on into different bins or something and he would have a lot – he would have to take a lot more time than, you know, somebody with both eyes."  (AR 91.)  Dr. Gelber added that "it would take [Claimant] a little longer with the one eye," stating that "he would have a harder time [seeing] something that was small or had to be placed in a certain area."  (AR 93.)  Dr. Gelber added, "He could do it," but "it would take him longer" and "he would be moderately slower than somebody . . . who had both eyes and good depth perception."  (AR 93-94.)  Dr. Gelber concluded that any jobs that require "some . . . degree of depth perception" would be "out of the picture."  (AR 95.)

During his testimony, the ALJ asked Dr. Gelber whether Claimant would have a limited ability to do close-up work requiring the ability to distinguish shapes, sizes, and the nature of small objects by viewing them.  (AR 94-95.)  Dr. Gelber responded by asking Plaintiff whether her husband was able to read a newspaper.  (AR 94.)  She responded,

18-cv-01015-W (JLB)

"No." (AR 94.) Dr. Gelber therefore responded to the ALJ's question by stating: "Well I think, you know, if they can't read a newspaper it would be hard to find work, you know, when you can't read instructions." (AR 95.) Dr. Gelber then opined that Plaintiff "was definitely handicapped." (AR 95.) However, Dr. Gelber ultimately agreed with the ALJ's statement that Claimant's "ability to distinguish small objects, such as nuts, bolts and screws . . . would not have been eliminated but . . . would have been substantially compromised." (AR 95-96.)

Dr. Gelber further opined that even though Claimant had a driver's license at the time he passed away, he did not think a person with Claimant's vision could drive. (AR 90-91.) However, he later added that he "could drive slowly," but was not going to be "on the freeway passing people and doing stuff." (AR 96.) Dr. Gelber noted that Claimant "would have limitations in . . . trying to judge how far a car is away from him." (AR 96.) Dr. Gelber also opined that he did not think Claimant would have any problem with color. (AR 92.)

Upon questioning by Plaintiff's attorney, Dr. Gelber further opined that Claimant's far vision was also compromised. (AR 97.) He stated: "20/40 is not normal, you know, real acute vision. It's going to be fuzzy." (AR 97.)

b. *ALJ's Decision*

The ALJ summarized Dr. Gelber's testimony in his decision. (AR 23-24.) The ALJ further summarized the work restrictions identified by Dr. Gelber arising from Claimant's poor visual acuity in the right eye as follows:

- The claimant would be precluded from jobs that require depth perception;
- The claimant would be substantially compromised (meaning it would take him substantially longer) in his ability to perform jobs requiring him to distinguish, identify or sort small objects, such as nuts, bolts, and screws;

///

///

18-cv-01015-W (JLB)

- The claimant could drive *slowly*, but should not drive at higher rates of speed, such as on the freeway.

(AR 24 (emphasis in original).) The ALJ then gave "significant weight" to Dr. Gelber's opinions regarding Claimant's limitations and stated that the RFC "is an attempt to articulate Dr. Gelber's testimony, viewed in its entirety and in light of the record, including the medical record, as a whole, in an accurate, precise, vocationally-meaningful way." (AR 24.) The ALJ explained his translation of Dr. Gelber's testimony into Claimant's RFC as follows:

> For example, Dr. Gelber stated the claimant's ability to engage in tasks involving the distinguishing of small objects was compromised to some extent, so that he could engage in such tasks, but it would take him longer than it would take an individual with two good eyes; the RFC takes this testimony into account by limiting the claimant to *occasional* near acuity. As another example, Dr. Gelber testified concerning difficulties the claimant would have had determining the distance between certain objects (when driving, for example), so that the claimant was able to drive, but slowly; the RFC takes this testimony into account by limiting the claimant to *occasional* far acuity. The claimant's monocular vision and depth perception difficulties were also the basis for the preclusion in the RFC of *all* exposure to hazards, such as moving machinery and unprotected heights.
>
> In some respects, in fact, and in order to give the claimant the benefit of the doubt, the residual functional capacity is *more* restrictive than the testimony of Dr. Gelber would indicate. For example, though Dr. Gelber stated the claimant could drive (with the limitations noted above), the RFC in contrast precludes driving completely.

(AR 24 (emphasis in original).)

The ALJ further noted that he gave little weight to Dr. Gelber's statements on the issue of whether Claimant met or medically equaled a listing, because his testimony on this point was "unclear and imprecise, and possibly inconsistent with the regulations." (AR 23.) The ALJ added that "[v]iewing his testimony as a whole, it appears that his comment that the claimant met the listing in the right eye meant only that the claimant was in fact essentially blind in that eye. If, as does *not* appear to be the case, Dr. Gelber was of the

opinion that the claimant actually met Listing 2.02, this opinion would be directly contrary to the medical record since, as noted earlier . . . , the claimant's corrected vision in the better eye was not 20/200 or worse." (AR 24.)

c.    *Analysis*

Plaintiff argues that the ALJ "erroneously made up a contorted analysis of Dr. Gelber's testimony by eliminating unfavorable parts of the testimony and only considering the parts supporting a denial of benefits." (ECF No. 16-1 at 13.) However, based on the Court's review of the record, as laid out above, the Court finds that the ALJ accurately summarized Dr. Gelber's testimony regarding Claimant's limitations and incorporated the only functional limitations identified by Dr. Gelber into the RFC.

Although Dr. Gelber made statements during his testimony such as "I don't know who's going to hire him" and "if they can't read a newspaper it would be hard to find work," Dr. Gelber did not identify any concrete functional limitations that the ALJ failed to incorporate into his RFC. In fact, the ALJ gave Claimant the benefit of the doubt by including the limitations that he could not drive and was limited to no depth perception, when Dr. Gelber variously opined during his testimony that Claimant could "drive slowly" and would only have "some problem" with depth perception. (AR 93, 96.) The ALJ also repeatedly asked Dr. Gelber during the hearing if Claimant would have any additional limitations as far as "near acuity" and "far acuity," but Dr. Gelber did not identify any additional limitations which are not incorporated into the RFC. (*See, e.g.*, AR 92-93, 96.)

Plaintiff claims that Dr. Gelber testified that Claimant had severely restricted or no far acuity, and the ALJ therefore erred in determining that Claimant had occasional far acuity. (ECF No. 16-1 at 23-26.) "Far acuity" is defined as "clarity of vision at 20 feet or more." (*Id.* at 23.) However, the Court notes that Plaintiff testified at the initial hearing that when her husband was sitting on the passenger side in the car, when they got "close to the exit sign or the street sign, he could see them, but if I hand him a paper where the font is maybe size ten or so, he wouldn't be able to see." (AR 52.) Therefore, although Dr. Gelber testified that Claimant's far vision would be "fuzzy," (AR 97), there was also

evidence in the record suggesting that Claimant could read street signs at twenty feet. (AR 52.)

Furthermore, the Court agrees with the ALJ's interpretation of Dr. Gelber's testimony regarding Claimant's right eye being at "finger counting and that would meet the listing and he would be a one-eyed patient." (*See* AR 23-24 n.4, 88.) As Claimant's right eye was his worse eye, the most natural and logical interpretation of this testimony is that Dr. Gelber was acknowledging that under the standard of Listing 2.02, Claimant was blind in his right eye and thus "he would be a one-eyed patient." Dr. Gelber was not, in that part of his testimony, addressing Claimant's vision in his better eye. It would be irrational to interpret Dr. Gelber's testimony on this point to be that Dr. Gelber was opining Claimant's vision in his left eye met the standard of Listing 2.02.

Accordingly, the Court finds that the ALJ did not improperly characterize or reject the opinions of Dr. Gelber.

### D. Adverse Credibility Determination

#### 1. Legal Standard

##### a. *Claimant's Testimony*

It is well established in the Ninth Circuit that if the claimant has produced objective medical evidence of impairments that could reasonably be expected to produce some degree of pain and/or other symptoms and the record is devoid of any affirmative evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of the claimant's pain and/or other symptoms only if the ALJ makes specific findings stating clear and convincing reasons for doing so. *See Smolen*, 80 F. 3d at 1281-92; *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Bunnell v. Sullivan*, 947 F. 2d 341, 343 (9th Cir. 1991); *Cotton*, 799 F.2d at 1407.

It is incumbent on the ALJ to specify which of the claimant's statements concerning his symptoms and functional limitations were not credible and in what respect the statements lacked credibility. *See Reddick*, 157 F.3d at 722; *see also Lester*, 81 F.3d at 834 ("General findings are insufficient; rather, the ALJ must identify what testimony is not

credible and what evidence undermines the claimant's complaints."). The ALJ is guided by "ordinary techniques of credibility evaluation," and may consider inconsistencies with the medical record or in the claimant's testimony, unexplained failures to seek treatment, and whether the claimant engages in activities of daily living that are inconsistent with the alleged symptoms. *See Molina*, 674 F.3d at 1112-13 (citations omitted).

An ALJ's assessment of claimant credibility is entitled to "great weight." *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989); *see also Nyman*, 779 F.2d at 531. "When evidence reasonably supports either confirming or reversing the ALJ's decision, [courts] may not substitute [their] judgment for that of the ALJ." *Batson*, 359 F.3d at 1196.

### b. *Lay Testimony*

In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work. *See Dodrill*, 12 F.3d at 919; *see also Revels*, 874 F.3d at 655; 20 C.F.R. §§ 404.1529(c)(3). Indeed, "lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citations omitted). Consequently, "[i]f the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." *Dodrill*, 12 F.3d at 919; *see also Lewis*, 236 F.3d at 511 ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.") (citations omitted). Lay witness observations may not be discounted on account of the applicant's lack of credibility. *Dodrill*, 12 F.3d at 918.

### 2. Background

#### a. *Testimony of Claimant and Plaintiff*

In a Disability Report, dated March 5, 2014, Claimant listed the following physical or mental conditions that limited his ability to work: (1) retina detachment; (2) Type 2 diabetes; (3) hypertension; (4) arthritis; (5) cholesterol; (6) memory loss; (7) chronic headaches; (8) insomnia; and (9) depression. (AR 295.) Claimant reported taking

Atorvastatin and Metformin for his diabetes, Naprosyn for his arthritis, Cymbalta and Vibyed for his depression, Fanayst for his insomnia, and Lisinopril for his heart disease. (AR 298.)

In a Function Report, dated March 21, 2014, Claimant stated that his illnesses, injuries, or conditions limited his ability to work in the following ways: "I get weak and tired fast. Sometime[s] I forget stuff. My conditions limit my ability to see, drive, work, and move around in unfamiliar place[s] and environment[s]." (AR 307.) Claimant reported having a hard time falling asleep and stated that he could not drive or work. (AR 308.) Claimant noted that his typical daily routine included breakfast, walking around the block, doing housework, eating lunch, watching a little television, eating dinner, showering, and going to bed. (AR 308.) Claimant's hobbies included watching television, surfing the internet, and going to the gym. (AR 311.) He reported being able to do these things very well and going to the gym twice a week. (AR 311.) When he went to the gym, Claimant needed someone to accompany him. (AR 311.)

Claimant also reported preparing his own meals on a daily basis as well as cleaning the house and doing laundry for one to two hours once a week. (AR 309.) Claimant reported going outside two to three times a week and stated that he traveled by riding in a car or by riding a bicycle. (AR 310.) Claimant was able to do grocery shopping once a week for about an hour, but had a hard time paying the bills and handling money because he had a hard time reading. (AR 310-11.) Claimant reported spending time with others, including talking to them, walking around, and eating together. (AR 311.) Claimant further reported no problems getting along with family, but he did not go out to see friends often after his conditions began. (AR 312.)

Claimant reported that his illnesses, injuries, or conditions affected his ability to walk and see. (AR 312.) Claimant noted that he needed to rest for five minutes after walking for twenty feet. (AR 312.) Claimant's conditions also affected his memory and concentration. (AR 312.) Claimant reported finding it hard to focus for a long time and could only pay attention for ten minutes. (AR 312.) He also had memory issues where he

would sometimes forget stuff.  (AR 312.)  Claimant stated that he was "ok" at following written instructions, getting along with authority figures, and handling changes in routine, but he did not follow spoken instructions or handle stress too well.  (AR 312.)  Claimant added that two of his medications made him dizzy and gave him headaches.  (AR 314.)

In a separate Function Report filled out by Plaintiff on the same date, she stated that her husband's illnesses, injuries, or conditions limited his ability to work in the following ways: "He is blind.  His right eye[] needs multiple[] surgeries due to diabet[ic] retina detachment.  Anthony is unable to see, drive, and perform work duties."  (AR 320.)  Although her husband stated that he did not need help or reminders with daily activities, his wife stated that he did need help or reminders to brush his teeth, shower daily, and take his medicine.  (AR 309, 322.)  Plaintiff also stated that she prepared her husband's meals because her husband was unable to see.  (AR 322.)  Plaintiff further stated that her husband traveled by walking or by riding in a car.  (AR 323.)  She added that it was dangerous for him to be left outside alone because his vision was not clear.  (AR 323.)

In addition, Plaintiff stated that her husband's illnesses, injuries, or conditions affected his ability to lift, squat, bend, stand, reach, walk, kneel, hear, climb stairs, see, and use his hands.  (AR 325.)  Plaintiff further stated that her husband had difficulty with his memory and concentration, and difficulty with understanding, following instructions, and getting along with others.  (AR 325.) Plaintiff elaborated that Claimant could only lift up to fifteen pounds, could not walk more than fifty feet unless assisted by others, and could not complete tasks because he tended to forget and could not remember the routine.  (AR 325.)  Plaintiff noted that Claimant did not finish what he started.  (AR 325.)  Plaintiff added that Claimant could only walk twenty to fifty feet before needing to rest for five minutes.  (AR 325.)  Plaintiff stated that Claimant's ability to follow written instructions was "average," but his ability to listen was poor and he did not comprehend spoken instructions.  (AR 325.)  In all other respects, Plaintiff's report was consistent with Claimant's report.  (*See* AR 307-28.)

On his Appeal form, dated July 27, 2014, Claimant represented that he had poor memory and needed to be reminded to take his medications. (AR 342.) He stated that he could not function by himself, but rather depended on his family to take care of him and prepare food for him. (AR 342.) He added that he stayed home all the time and could not go anywhere or do anything due to his poor vision. (AR 342.) He further noted that he was depressed and anxious about his condition. (AR 342.)

In a subsequent Disability Report, submitted December 11, 2014, Claimant represented that his vision was "getting worse and worse" and he was "more depressed" and had "worsening memory loss." (AR 357.) He added that he was "anguished." (AR 358.) He stated that he needed help bathing and preparing food. (AR 364.) He stated that he could not see well to cook or tie his shoes. (AR 364.) He stated that he was "more dependent on his wife to cook for [him] and to remind [him] to take medicines." (AR 364.) He stated that he was "helpless and hopeless." (AR 364.)

Claimant passed away on July 13, 2016. (AR 293.) Therefore, only Plaintiff testified at the administrative hearings. She testified as follows:

Claimant was fired from his last job in 2011 because he was having a hard time seeing at work. (AR 48.) Claimant tried to find another job but could not find work. (AR 48.) The last time Claimant drove was 2013. (AR 49.) The vision in Claimant's left eye was stable after surgery, but the surgery did not improve his vision. (AR 50-51.) The vision in Claimant's right eye, however, just kept getting worse. (AR 49-50.) Claimant did not do a lot of reading because he could not see most of the time. (AR 51.) He would go outside and walk back and forth down the street. (AR 51.) Claimant was not aware of what her husband did during the eight hours she was at work, but when she would call and check in, he would be sitting or walking outside or watching television. (AR 51.) Claimant would just listen to the television. (AR 51.) Claimant could read street signs when they drove close to them, but could not see small font, such as the font in a newspaper. (AR 52.) In addition to his vision problems, Claimant had diabetes and high blood pressure.

(AR 52.)  As a result, Claimant would be tired and occasionally nap and always complained about blurred vision.  (AR 52-53, 56.)

Claimant did not have a problem using his hands, but did have a problem with lifting things because the doctor informed him that it would put a stress on his vision.  (AR 53.)  Claimant was not supposed to lift anything over twenty pounds.  (AR 54.)  Claimant was not allowed to cook at home because he burned himself once.  (AR 57.)  His retired father stayed with him at home and looked out for him.  (AR 57.)  After Claimant stopped working, there was always someone with him.  (AR 57-58.)  On the weekends, Claimant stayed home, walked the dog, watched television, listened to the radio, and rested approximately a third of the day.  (AR 58-59.)  Plaintiff or Claimant's father would drive him to the doctor's office.  (AR 59.)  His father would also drop him off at the gym.  (AR 59.)  At home, Claimant would help out by washing plates.  (AR 59.)

During the supplemental hearing, Plaintiff testified that her husband had a driver's license before he passed away, but he was not able to drive.  (AR 87.)  She further stated that her husband was unable to read a newspaper.  (AR 94.)

### b. *ALJ's Decision*

The ALJ found that Claimant's medically determinable impairments could reasonably be expected to have caused the alleged symptoms; however, the ALJ found that Claimant's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (AR 22.)  The ALJ first considered the testimony and written statements of Plaintiff.  (AR 25.)  He described her statements as follows:

> [Plaintiff] described the claimant's activities as eating breakfast and napping, noting that she worked and did not see him during the day ([AR 320-28]).  She reported the claimant had no problem with personal care; he prepared his own meals, cleaned the furniture, and did light loads of laundry; he went out 2-3 times a week, shopped in stores, and went to the gym twice a week.  He did not play sports because of his vision problems, and he had multiple surgeries due to retinal detachment.  Id.

At the August 2016 hearing, [Plaintiff] testified that the claimant was unable to work because of his eyesight; he had difficulty driving, and he last drove in 2013. His right eye kept getting worse, and he had multiple surgeries on the right eye. He had one surgery on the left eye, and the vision improved in his left eye. The claimant had diabetes mellitus and hypertension, but he had no problem using his hands (Testimony).

(AR 25.)

The ALJ gave "significant weight" to these statements made by Plaintiff because they were generally consistent with the evidence of record. (AR 25.) However, the ALJ gave less weight to Plaintiff's assertions that Claimant had problems with lifting, squatting, bending, standing, reaching, walking, kneeling, hearing, stair climbing, memory, completing tasks, concentrating, understanding, following instructions, using hands, and getting along with others. (AR 25 (citing AR 325).) The ALJ stated that these statements were entitled to less weight "to the extent they might suggest a more restrictive level of functioning than found [in the ALJ's decision], because to that extent they would be inconsistent with the evidence of record as a whole, including the claimant's reported activities and the medical record." (AR 25.)

For example, the ALJ noted that Claimant only reported in his March 21, 2014 Function Report problems with walking, seeing, memory, and concentration. (AR 25 (citing AR 312).) Claimant also reported that he had no problems getting along with family, friends, neighbors, and others; he finished what he started; and he was able to follow written instructions. (AR 25 (citing AR 312).) Claimant further reported that he went to the gym and worked out on a regular basis, and he spent time with others talking, walking around, and eating. (AR 25 (citing AR 324).) The ALJ thus concluded that Plaintiff's statements were "not fully consistent with those of the claimant at that point in time." (AR 25.) He added that this was "certainly not to suggest intentional exaggeration or misstatement, but only to note that, as often is the case, two persons with two different perspectives do not see or assess matters in exactly the same way." (AR 25.)

18-cv-01015-W (JLB)

Next, the ALJ addressed Claimant's statements regarding the extent and severity of his impairments and the limitations they cause. (AR 25.) The ALJ found that with respect to Claimant, "the evidence submitted does not support that functional limitations existed at a disabling level." (AR 25-26.) The ALJ explained as follows:

> The claimant stated he became weak and tired quickly, that he could walk for only short distances, and that his conditions limited his ability to see, drive, work, and move around in unfamiliar environments. He stated he had difficulty concentrating for long periods of time and had memory problems. On the other hand, as noted above, the claimant reported that he worked out on a regular basis, he liked to go to the gym and exercise, and he spent time with others talking, walking around, and eating ([AR 307-15, 475]). He also indicated that he had made attempts to return to work, but he could not find employment, and he stated his symptoms did not limit his daily activities ([AR 475]). Some of these matters provide additional support for the residual functional capacity found above.

(AR 26.) The ALJ concluded that "[t]o the extent that the claimant's statements might be inconsistent with that residual functional capacity, they are not supported by or consistent with the record as a whole, including objective signs and findings, as discussed elsewhere in this decision." (AR 26.)

### 3. Analysis

#### a. *Claimant's Testimony*

Because the Commissioner has not argued affirmative evidence of malingering, the Court will apply the "clear and convincing" standard to the ALJ's adverse credibility determination. *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014) (applying "clear and convincing" standard where the government did not argue that a lesser standard should apply based on evidence of malingering); *see also Ghanim*, 763 F.3d at 1163 n.9 (same).

The Court finds that the ALJ gave clear and convincing reasons supported by specific findings for discounting Claimant's testimony regarding the severity of his mental and physical limitations to the extent not contained within the RFC. First, the ALJ explained that Claimant's activities of daily living were inconsistent with his allegations of total disability. *See Molina*, 674 F.3d at 1112-13 (finding inconsistencies between a

claimant's testimony and daily activities which were supported by substantial evidence in the record constituted a clear and convincing reason for rejecting the claimant's testimony regarding the severity of the symptoms). Next, the ALJ observed that Claimant's testimony was internally inconsistent. *Smolen*, 80 F.3d at 1284. For example, the ALJ noted that Claimant reported that he became weak and tired quickly and could walk for only short distances, but he also reported that he went to the gym twice a week, and his daily routine included walking.

The ALJ further recognized that Claimant reported having difficulty concentrating for long periods of time and memory problems. (AR 25-26.) As laid out above, Claimant reported in his Function Report that he found it hard to focus for a long period of time and could only pay attention for ten minutes. (AR 312.) He also reported memory issues and problems following spoken instructions. (AR 312.) However, the ALJ noted in his decision that while Claimant reported to Dr. Andia problems with memory and concentration, he also stated that his ability to work had not been affected by these symptoms. (AR 18 (citing AR 474).)

The ALJ further rejected Claimant's testimony regarding the severity of his symptoms because it was "not supported by or consistent with the record as a whole, including objective signs and findings, as discussed elsewhere in [his] decision." (AR 26.) In May 2014, Dr. Andia tested Claimant's memory and concentration. (AR 477.) Claimant's digit span was five forward and three backward. (AR 477.) Claimant was able to recall 3/3 items immediately and 3/3 items after five minutes. (AR 477.) Claimant could not recall how President Kennedy died, but he did know the name of the current President of the United States and the name of the current Governor of California. (AR 477.) Claimant also knew that Washington, D.C. is the capital of the United States and that Sacramento is the capital of California. (AR 477.) In addition, although Claimant was unable to perform serial sevens, he was able to perform serial threes. (AR 477.) Claimant was also able to do simple calculations and follow the conversation well. (AR 477.) Based on her examination, Dr. Andia concluded that Claimant was able to understand, remember

and carry out simple one or two-step job instructions and only mildly limited in his ability to maintain concentration and attention, persistence and pace due to depressive symptoms. (AR 478-79.)

The Court acknowledges that in March 2014, Dr. Henderson noted that Claimant complained of memory loss and anxiety about his life. (AR 767.) He added that Claimant's "[p]ain, depression and recurrent obsessive thoughts interfere with concentration and attention." (AR 767.) Based on his examination, Dr. Henderson stated that Claimant could not recall three nouns after three minutes and could not perform serial 3s. (AR 767.) He further noted that his ability to concentrate upon even simple new tasks was poor. (AR 767.) Dr. Henderson opined that Claimant often had "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner in work setting or elsewhere." (AR 768.) However, as set forth above, the ALJ properly rejected the opinions of Dr. Henderson. Therefore, although there is some evidence in the record supporting Claimant's testimony regarding his poor memory and inability to concentrate, for the reasons discussed above, the ALJ properly rejected Dr. Henderson's opinions regarding Plaintiff's limitations.

Accordingly, the Court finds the ALJ's determination that the Claimant's testimony regarding the severity of his symptoms was not supported by or consistent with the record as a whole, including objective signs and findings, was also a clear and convincing reason supported by specific findings for discounting Claimant's testimony regarding the severity of his mental and physical limitations to the extent not contained within the RFC.

b.    *Plaintiff's Testimony*

The ALJ gave "less weight" to Plaintiff's statements that Claimant had "problems with lifting, squatting, bending, standing, reaching, walking, hearing, stair climbing, memory, completing tasks, concentrating, understanding, following instructions, using hands, and getting along with others." (AR 25 (citing AR 325).) The ALJ gave less weight to these statements "to the extent they might suggest a more restrictive level of functioning than found herein, because to that extent they would be inconsistent with the evidence of

record as a whole, including the claimant's reported activities and the medical record." (AR 25.)

In his decision, the ALJ described the inconsistencies between the Third Party Function Report completed by Plaintiff the same day as the Function Report filled out by Claimant. (AR 25.) The ALJ noted that Claimant identified greater restrictions than her husband at the same point in time. (AR 25.) The Court finds that this inconsistency is a germane reason to disregard her testimony to the extent it reflected greater restrictions than those identified in the RFC. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008) (finding that the ALJ provided a germane reason to reject a lay witness's testimony where the testimony was inconsistent with the record).

Moreover, in light of the Court's conclusion that the ALJ provided clear and convincing reasons for rejecting Claimant's own subjective complaints, and because Plaintiff's testimony in other respects was similar to such complaints, including Claimant's difficulty with memory and concentration, it follows that the ALJ also gave germane reasons for rejecting Plaintiff's testimony, to the extent the testimony was similar. *See Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) ("In light of our conclusion that the ALJ provided clear and convincing reasons for rejecting [the claimant's] own subjective complaints, and because [his wife's lay] testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting her testimony.").

### E.    The ALJ's Step Five Determination

At Step Five of the sequential evaluation process, the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). At this step, Plaintiff contends that the ALJ improperly disregarded the testimony of the first VE. (ECF No. 16-1 at 27-28.) However, Plaintiff mischaracterizes the first VE's testimony. The first VE identified three jobs that all required frequent near acuity. (AR 66-67, 72-73.) Therefore, the VE testified that if Claimant was limited to occasional near acuity "he could not do the jobs because it calls

for frequent." (AR 73.) The second VE, on whom the ALJ relied, identified different jobs, each of which require only occasional or no near acuity to perform. (AR 28, 111.) Accordingly, the Court finds that the ALJ did not err at Step Five.

## VI. CONCLUSION AND RECOMMENDATION

For the reasons set forth herein, the Court **RECOMMENDS** that that Judgment be entered affirming the decision of the Commissioner and dismissing this action with prejudice.

Any party having objections to the Court's proposed findings and recommendations shall serve and file specific written objections within **fourteen (14) days** after being served with a copy of this Report and Recommendation. *See* Fed. R. Civ. P. 72(b)(2). The objections should be captioned "Objections to Report and Recommendation." A party may respond to the other party's objections within **fourteen (14) days** after being served with a copy of the objections. *See id.*

**IT IS SO ORDERED.**

Dated: August 5, 2019

Hon. Jill L. Burkhardt
United States Magistrate Judge

18-cv-01015-W (JLB)